**Opinion issued December 14, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-21-00490-CV

_____

## KJELL AND JENNIFER ANDERSON, Appellant

## V.

## ANDREA MONICO HERNANDEZ, Appellees

---

**On Appeal from the 247th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-33707**

---

## MEMORANDUM OPINION

Appellants Kjell and Jennifer Anderson filed a suit affecting the parent-child relationship seeking custody of Andrea Monico Hernandez's then four-year-old daughter, "Dora."[1] After an evidentiary hearing on a request for temporary orders,

---

[1] Dora is a fictitious name.

the trial court found that there was no evidence of a significant impairment to Dora's physical health or emotional well-being from remaining in her mother's care. The Andersons voluntarily nonsuited their SAPCR, and Andrea sought sanctions and attorney's fees. After an evidentiary hearing on the sanctions motion, the trial court ordered the Andersons to pay Andrea's attorney's fees in the amount of $10,710 and sanctions in the amount of $10,000. The Andersons raise two issues, arguing that the evidence is legally and factually insufficient to support the trial court's order and that the trial court erred by awarding sanctions.

We affirm.

### Background

Andrea came to the United States from El Salvador as an unaccompanied minor. She had no family in the United States, and, when she arrived, she was 14 years old and pregnant with Dora, who is the subject of the underlying SAPCR. Andrea gave birth to Dora and lived in a group home with her until Dora was about 18 months old. After that, Andrea lived in several foster care placements with Dora under a program for unaccompanied minors. Andrea's first foster placement was with Veronica Funke and her husband. Veronica testified that, in early 2019, either Catholic Charities, who had placed Andrea in her home, or the Department of Family and Protective Services, decided to relocate Andrea to another home,

2

despite the Funkes' desire for them to stay.[2] When Andrea left the Funkes' home, Catholic Charities instructed Andrea and the Funkes not to communicate with each other.[3] After leaving the Funkes' home around February 2019, Andrea, along with Dora, was placed in two or three separate foster care placements.

In June 2019, Catholic Charities placed Andrea with the Andersons, who became her foster parents. At that time, Andrea was 17 years old, and Dora was two months shy of her third birthday. Although both Andrea and Dora moved into the Andersons' home, the Andersons were not Dora's foster parents. The Andersons are also the biological parents of four children, who ranged in age from approximately four to nine years old when Andrea and Dora moved in.

Andrea and the Andersons tell somewhat different stories about what happened while she was in their care. Andrea testified at the sanctions hearing that she initially trusted the Andersons when she moved into their home, but she later came to "regret it."[4] Andrea also testified that when she lived with the Andersons, she stayed at home with them and Dora every night.

Andrea admitted that she had been treated by counselors for depression, anxiety, and post-traumatic stress disorder, but she denied having seen a

---

[2]     In her testimony, Veronica Funke said "the agency" made the decision for Andrea to leave, but it was not clear to which entity Funke was referring.

[3]     The appellate record does not provide a reason for Andrea's removal from the Funkes' home.

[4]     Andrea testified through a Spanish-language interpreter.

psychiatrist or receiving any other psychiatric diagnosis. Andrea also revealed that sometime in 2018, before she came to live with the Andersons, she attempted suicide by overdose, but she denied that an incident involving self-harm that occurred in the Andersons' home was a suicide attempt. Andrea testified that, in December 2019, she locked herself in the bathroom and cut her arms with a razor because she was "stressed" and under "a lot of pressure." Dora was in a nearby bedroom at the time.

After the self-harm incident in December 2019, Andrea spent almost two weeks in a mental health hospital before returning to the Andersons' home. Upon her return, Andrea signed a power of attorney in their favor regarding Dora's care. But Andrea testified that she did not sign it freely or voluntarily. She said: "They made me sign a document, but it wasn't to make me give them [Dora's] custody. . . . [T]hey told me that the document was . . . a permission for them to be able to take [Dora] to the doctor."

Andrea said that after she signed the document, the Andersons asked her to go to a mental health facility for a year. Andrea declined, and, having turned 18 years old by then, she left the Andersons' home and the foster care program in February 2020. Andrea testified that the Andersons did not allow her to take Dora

with her. She said she asked them to take Dora, but they refused, saying "that wasn't their problem anymore . . . it was CPS's problem."[5]

The Andersons maintained that they cared for Dora because Andrea "did not want to be involved." Jennifer testified that Andrea failed to address her mental health concerns while living with them and that she neglected Dora. Jennifer believed that Dora had special needs, and she testified about the issues she noticed in three-year-old Dora:

> [F]or her age group, based on my observations, she was—she was not communicating well. She was extremely over emotional. She would have extremely long tantrums, extreme aggression, lack of empathy. There were many things. Self-help skills were next to zero. She had a plethora of very major problems.

Jennifer acknowledged that Dora and Andrea had lived in several homes, including several foster placements between February and June 2019, but Jennifer denied that this social history explained Dora's issues. Jennifer arranged for Dora to be evaluated by "a team of specialists at Black Elementary" and to receive care from a pediatrician, a play therapist, and special education preschool that she attended five days a week at the public elementary school near the Andersons' home. Jennifer testified that she tried to involve Andrea in the evaluations, but Andrea did not want to be involved with answering questionnaires.

---

[5] The parties sometimes referred to the Department of Family and Protective Services as CPS (child protective services).

5

Jennifer described Andrea's self-harm incident in December 2019 as a suicide attempt. Jennifer said that when she discovered Andrea in the locked bathroom, she called the Catholic Charities caseworker, who called emergency services. Jennifer contacted the Department of Family and Protective Services while Andrea was in the hospital after the December 2019 cutting incident. Jennifer said that a DFPS caseworker instructed her to obtain a power of attorney from Andrea, but Jennifer could not recall the caseworker's name. The power of attorney that Andrea signed was notarized by the Catholic Charities caseworker who worked with the Andersons.

Jennifer denied that she or her husband verbally or physically abused Andrea. Jennifer said that Andrea left voluntarily in February 2020. Both Jennifer and Kjell testified that Andrea abandoned Dora and told them she was leaving their home to live with a boyfriend and engage in illegal activities. Kjell testified:

> When she left our house, she stated that she was leaving to be a drug-dealing prostitute. And she did not take any of her medications with her. And she left with her boyfriend, and did not leave with any kind of a communication plan or any—nothing, no nothing for what we were supposed to do with [Dora]. She just abandoned her.

Both Jennifer and Kjell testified that Andrea never asked for Dora after leaving their home.

Veronica Funke testified that Andrea came to her house in February 2020. She described Andrea as "very desperate," and she testified that Andrea told her

6

that the "agency" and the Andersons had taken Dora from her. Veronica testified that she took Andrea to meet with an attorney, who filed a petition for writ of habeas corpus to reunite Andrea with Dora.

A transcript of the May 22, 2020 writ hearing is not in the appellate record, but the parties agree that the allegations that Andrea was involved in prostitution and drug dealing were shared with the trial court during it. After hearing evidence and argument at the hearing, the trial court determined that there was no serious immediate question regarding Dora's safety, and it ordered that Dora be immediately surrendered to Andrea. Veronica and her husband accompanied Andrea to the Andersons' house to pick up Dora. Again, the parties recalled this interaction differently.

Veronica testified that both Jennifer and Kjell were hostile toward Andrea. Veronica heard Jennifer say to Andrea: "You lied, didn't you, how could you do this to our family, you are breaking up our family." Veronica heard Kjell say to Andrea: "You think you are getting away with this, you're not going to get away with this, the only reason we are letting you take her is because CPS hasn't arrived here in time, you'll be hearing from CPS on Monday." Andrea testified that they threatened her by saying that they were "coming back for" Dora.

Jennifer testified that the handoff of Dora to Andrea was "very brief" and that there was "nothing even remotely threatening or harassing about it," and "it

7

was a very calm handoff." Jennifer said: "[Dora] was clinging to me. She didn't want to go. She was crying and saying she didn't want to leave." Kjell testified that he told Andrea that the situation made him sad and that he was disappointed. The Andersons' neighbor, Daryl Runge, testified that he was present during the handoff, which he called "very short" and "uneventful." Jennifer testified that she contacted DFPS on May 22, 2020 after the court ordered that Dora be returned to Andrea. She denied that this was a new report and maintained that this was part of ongoing communication that began when both Andrea and Dora lived with them. Jennifer and Kjell maintained that, after Andrea left in February 2020, DFPS had instructed them to call 911 or DFPS if Andrea attempted to take Dora from their home. Aside from a couple of brief text messages, the Andersons had no further direct contact with Andrea or Dora after the handoff.

On June 4, 2020, two weeks after the Andersons returned Dora to Andrea, they filed suit seeking appointment as Dora's sole managing conservators. In their live pleading, they alleged that Andrea had "a history or pattern of child neglect," and that she "failed to parent" Dora from the day she arrived in their home, June 2, 2019, and "abandoned [Dora] entirely" when she left in February 2020. The Andersons alleged that they had standing because they were not Dora's foster parents and they had "actual care, control, and possession of [Dora] for at least six months ending not more than 90 days preceding the date of filing of the petition."

8

At the sanctions hearing, Jennifer explained why they filed suit: "We developed a long relationship with [Dora] in the year taking care of her, and we were very concerned that her special needs were not being met. So, we filed for custody, hoping that it would be her best chance at having safety and stability."

After Dora's return, Andrea, who had been staying with the Funkes, moved into an apartment that Veronica described as "nice . . . well kept . . . well organized." Dora was about four years old, and she was not enrolled in school at that time. In September 2020, the Andersons were questioned about why Dora was not taking the school bus to the preschool program in which they had enrolled her the previous year. In response, the Andersons, who had not seen Andrea or Dora since May 2020, called DFPS and made allegations of neglectful supervision by Andrea. They alleged that Andrea was "a drug-dealing prostitute," and that she was abusing drugs, mentally unstable, and not addressing Dora's educational and medical needs. These were many of the same allegations that they raised at the writ hearing and which the trial court rejected.

The Andersons had called DFPS about Andrea and Dora in December 2019, February 2020, May 2020, and September 2020. After Dora was returned to her mother, Queswanna Wilson, a DFPS caseworker, became involved in September 2020 and met with Andrea. When Wilson became involved with the case, she did

not know that the Andersons were seeking custody of Dora at that time. Neither did Andrea: she was not served with citation of the suit until January 2021.

Wilson testified that she investigated and found no evidence that Andrea was using drugs, selling drugs, or working as a prostitute. Nevertheless, Wilson said that DFPS asked Andrea to participate in services "due to her own admission of depression and anxiety, and suicide attempts, and not being able to acknowledge why her child was in previous care at her previous school." Wilson also mentioned other concerns, such as Andrea's uncertainty about her past psychological diagnoses, and lack of knowledge about "how to get her daughter back into the school, get her Medicaid started back up." Wilson said:

> [W]e were offering her services to help her be a better parent . . . . we wanted to . . . ensure that she had all the tools that she needed in case she ever got depressed again. . . . I wouldn't know if she would try to harm her child in one of her depression phases, when she'd attempted to commit suicide. . . . It could be something else. . . . Mental health can cause you to do a number of things. And so it's just the uncertainty of mental health.[6]

Initially, Andrea cooperated with DFPS, passing a drug test and taking Dora for a routine medical checkup after Andrea's attorney obtained Dora's birth certificate, social security card, and vaccination records from the Andersons. But

---

[6] There was no evidence that Andrea was suffering from any mental health challenge at any time after May 2020. Instead, DFPS relied on vague and speculative allegations of "mental health." Counsel for DFPS asked Wilson at the sanctions hearing: "[W]hat is neglect generally a sign of?" Wilson replied: "Mental health."

10

Andrea became concerned and frightened by repeated visits from DFPS in 2020 because there was no proof that she had mistreated, abused, or neglected Dora. Andrea and Dora left the apartment and moved in with the Funkes, where they lived at least until the sanctions hearing.

At the sanctions hearing, Veronica, who is a licensed clinical social worker, testified that when Andrea and Dora returned to her home, Andrea was "very afraid," and needed emotional support because she had no family in the United States. Veronica testified that she had no concerns about Andrea's mental health, and she did not believe Andrea's emotional state "impair[ed] her ability to parent" Dora. She noted, however, that Andrea had experienced numerous transitions, and she expressed her belief that "while she was placed in the Andersons' custody, she was subjected to a lot of emotional and verbal abuse, which led to her having emotional breakdowns, including the incident where she cut her arms." Veronica also said that Andrea "has a significant history of trauma," and that Andrea has "been a victim of severe trauma in her life."

Although Andrea initially cooperated with DFPS, she eventually directed Wilson to communicate exclusively with her attorney. In December 2020, DFPS intervened in the Andersons' SAPCR, seeking a court order requiring Andrea to participate in services. Danielle Delone, Wilson's supervisor, testified and

acknowledged that failure to complete such services could result in Dora's removal from Andrea.

In January 2021, after being served, Andrea answered the SAPCR, seeking dismissal of the Andersons' and DFPS's claims. She also sought sanctions (including attorney's fees) under Texas Rule of Civil Procedure 13, and sections 9.012 and 10.004 of the Texas Civil Practice and Remedies Code. Andrea argued that the Andersons and DFPS "intentionally fil[ed] frivolous pleadings, intending to intimidate and harass [her], and intending to cause embarrassment to and to harm [her]." She also asserted that the Andersons and DFPS "have engaged in conduct for the sole purpose of harassing [her] and causing [her] to incur attorney's fees and expenses by filing groundless pleadings and engaging in disingenuous legal maneuvering." She maintained that "[s]uch conduct [wa]s clearly contemplated, intentional[,] and for the purpose of harassing [her]."

In April 2021, the trial court heard the Andersons' request for temporary orders in the SAPCR and DFPS's request for services. The trial court denied both requests, stating: "The Court finds, after hearing evidence and testimony, that no evidence has been presented to show significant impairment to the child's physical health or emotional well-being." The Andersons dismissed their case, and the trial court dismissed DFPS's intervention.

The trial court then held a hearing on Andrea's motion for sanctions, during which Andrea testified that that the Anderson's litigation and the Department's investigations and joinder left her feeling overwhelmed and sad. She said it was costly, and she believed the extra expenses incurred due to the litigation impaired her ability to maintain stability in her life. She also said that she lived in fear that someone was coming to take her child.

In addition to evidence about the parties, Andrea's attorney testified about her reasonable and necessary attorney's fees, and her contemporaneous billing statements were admitted. The Andersons sought a directed verdict, saying that they filed suit because they believed they were "a better option in [Dora's] best interest." Based on the evidence adduced at the hearing, the trial court denied sanctions against DFPS and granted sanctions against the Andersons, awarding Andrea $10,000 plus $10,710 in attorney's fees.

In granting sanctions against the Andersons, the trial court made the following findings:

1.    THE ANDERSONS acted in bad faith in prosecuting this case.

2.    THE ANDERSONS acted not simply with bad judgment or negligence. On the contrary, they acted consciously in prosecuting this case for dishonest, discriminatory[,] or malicious purposes.

3.    Standing to seek conservatorship of a child does not protect THE ANDERSONS from allegations that their pleadings are groundless or brought for an improper purpose.

13

4. THE ANDERSONS maintained their standing, in part, by illegally withholding the child from ANDREA MONICO HERNANDEZ without cause. A habeas corpus was filed and this court determined that there was no serous immediate question regarding the child's safety and ordered that the child be immediately surrendered to the mother, ANDREA MONICO HERNANDEZ.

5. The same day this Court ordered the surrender of the child to the mother, THE ANDERSONS began using the Department of Family and Protective Services as an instrument in their campaign to keep ANDREA MONICO HERNANDEZ's child for themselves. Subsequently, in furtherance of their plan, THE ANDERSONS made at least one report to the Department of Family and Protective Services that was false or lacked factual foundation.

6. THE ANDERSONS' feigned concern about the child's safety or welfare was simply the expression of a feeling of entitlement to take someone else's child because in their opinion they were "better parents" or could offer a "better life." There is no legal support for the proposition that a non-parent can prevail over a parent on this basis alone.

7. Moreover, THE ANDERSONS actions interfered with this Court's core function, using court time and resources to further their improper goals.

8. The Court finds that this sanction is not excessive and is necessary to discourage or deter further abuse of this nature by THE ANDERSONS and other similarly situation.

The trial court ordered the Andersons to pay $10,000 in sanctions. The Andersons appealed.

**Analysis**

The Andersons raise two issues on appeal, challenging the trial court's award of attorney's fees and imposition of sanctions. The arguments for each issue are repetitious.

In their first issue, the Andersons argue that the trial court's determination of sanctions and attorney's fees is not supported by legally and factually sufficient evidence. They also argue that the trial court failed to state the legal provisions that support its sanctions award and to make findings of fact and conclusions of law. They argue that the trial court found that they had standing to bring the suit and did not find that their pleadings were groundless. These arguments do not properly reflect the standard of review, credit the evidence adduced at the sanctions hearing, or acknowledge the reasons for the sanctions that the trial court included in the order.

In their second issue, the Andersons again argue that there is no evidence to support the sanctions the trial court imposed. They argue that we must presume that they and their counsel filed all papers in good faith and that Andrea failed to overcome that presumption. They assert that there is no evidence that their suit was groundless and brought in bad faith or for the purpose of harassment. They maintain that they "had no malicious purpose" and "sought what they believed was

15

in the child's best interests." They also contend that their suit cannot be groundless because they had standing.

## I.      Standard of review

We review a trial court's sanctions order for an abuse of discretion. *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 717 (Tex. 2020); *see Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (per curiam) (stating that trial court's order imposing sanctions is reviewed for abuse of discretion). A trial court abuses its discretion if it acts without reference to guiding rules and principles, such that the ruling is arbitrary or unreasonable. *Brewer*, 601 S.W.3d at 717. "The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision." *Unifund CCR Partners*, 299 S.W.3d at 97.

Under our standard of review, we must review the entire record to determine whether it includes some evidence of a substantive and probative character that supports the trial court's decision. *See Brewer*, 601 S.W.3d at 717. ("A decision lacking factual support is arbitrary and unreasonable and must be set aside."). In doing so, we defer to the credibility decisions made by the trial court. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *Alpert v. Crain, Caton, & James, P.C.*, 178 S.W.3d 398, 412 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). "[L]egal and factual sufficiency of the evidence are not independent grounds of error, but

16

are merely factors to be considered in determining whether the trial court abused its discretion." *In re Roisman*, 651 S.W.3d 419, 440 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

When a party seeks attorney's fees as sanctions, she must demonstrate that the fees sought were necessary. *Nath v. Tex. Children's Hosp.*, 576 S.W.3d 707, 709–10 (Tex. 2019) ("*Nath II*"). This requires "some affirmative evidence of attorney's fees incurred and how those fees resulted from or were caused by the sanctionable conduct." *Id.* An award of attorney's fees must also comply with legal and evidentiary requirements to establish a reasonable attorney's fee in any other fee-shifting situation because all such awards must be reasonable. *Id.* (citing *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 492, 496 (Tex. 2019)).

## II.     Sanctions

### A.     Due process considerations

"[T]o safeguard constitutional due process rights, a sanction must be neither unjust nor excessive." *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 363 (Tex. 2014) ("*Nath I*") (citing *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991)). A sanction is "just" when it is "directed against the abusive conduct with an eye toward remedying the prejudice caused to the innocent party." *Id.* A just sanction is also "visited upon the true offender." *Id.* Thus, the trial court

"must attempt to determine whether the offensive conduct is attributable to counsel only, to the party only, or to both." *Id.* A sanction is not excessive when it is "no more severe than necessary to satisfy its legitimate purposes. . . . [which] may include securing compliance with the relevant rules of civil procedure, punishing violators, and deterring other litigants from similar misconduct." *Id.*; *see also Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007) ("To determine if sanctions were appropriate or just, the appellate court must ensure there is a direct nexus between the improper conduct and the sanction imposed.").

A trial court may be authorized to impose sanctions against a party or the party's attorney by rule, statute, or inherent authority. *See, e.g.*, TEX. R. CIV. P. 13 (Effect of Signing Pleadings, Motions and Other Papers; Sanctions); TEX. CIV. PRAC. & REM. CODE §§ 9.001–.014 (Frivolous Pleadings and Claims); *id.* §§ 10.001–.006 (Sanctions for Frivolous Pleadings and Motions); *Phillips v. Am. Bankers Ins. Co. of Fla.*, No. 01-18-00375-CV, 2019 WL 3121856, at *7 (Tex. App.—Houston [1st Dist.] July 16, 2019, pet. denied) (mem. op.) ("A trial court possesses the inherent authority to impose sanctions for a bad faith abuse of the judicial process even when the specific conduct is not covered by a rule or statute.").

**B.     Rule 13**

A trial court may impose sanctions pursuant to Rule 13 if a pleading is groundless and brought in bad faith or for the purpose of harassment. *See* TEX. R. CIV. P. 13; *Am. Fisheries, Inc. v. Nat'l Honey, Inc.*, 585 S.W.3d 491, 506–07 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "Groundless" means "no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." TEX. R. CIV. P. 13. "To determine if a claim is groundless, the trial court must objectively ask whether the party and counsel made a reasonable inquiry into the legal and factual basis of the claim at the time the document in question was filed." *WWW.URBAN.INC. v. Drummond*, 508 S.W.3d 657, 676 (Tex. App.—Houston [1st Dist.] 2016, no pet.). We determine whether the party and counsel made a reasonable inquiry into the legal and factual basis of the claim by considering the circumstances that existed when the document was filed. *Id.*

"Bad faith" means "the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes." *Thielemann v. Kethan*, 371 S.W.3d 286, 294 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). "Improper motive is an essential element of bad faith." *Gomer v. Davis,* 419 S.W.3d 470, 478 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "Bad faith does not exist when a party merely exercises bad judgment or is negligent." *Thielemann*, 371 S.W.3d at 294.

"To 'harass' means to annoy, alarm, and verbally abuse another person." *Id.* Whether a party or counsel acted in bad faith or for the purpose of harassment is also determined in reference to the circumstances that existed when the document was filed. *Drummond*, 508 S.W.3d at 676.

We "presume that pleadings, motions and other papers are filed in good faith." TEX. R. CIV. P. 13. The sanctions movant has the burden to overcome this presumption. *Low*, 221 S.W.3d at 614; *Thielemann*, 371 S.W.3d at 294. A trial court must hold an evidentiary hearing before imposing Rule 13 sanctions. TEX. R. CIV. P. 13. A court may not impose sanctions "except for good cause," and it must state "the particulars" of good cause in the sanction order. *Id.*

## C.    Chapter 10[7]

Section 10.001 of the Texas Civil Practice and Remedies Code provides that the signing of a pleading is a certification by the signatory that the signatory has made a reasonable inquiry and to his "best knowledge, information, and belief":

(1)    the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2)    each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

---

[7]    Andrea also pleaded for sanctions under chapter 9 of the Civil Practice and Remedies Code. That chapter is inapplicable here because it pertains only to tort claims. *See* TEX. CIV. PRAC. & REM. CODE § 9.001–.014.

(3)    each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4)    each denial in the pleading or motion of a factual contention is warranted on the evidence or, for a specifically identified denial, is reasonably based on a lack of information or belief.

TEX. CIV. PRAC. & REM. CODE § 10.001.

A trial court may impose a sanction on the signatory or a party represented by a signatory for violation of one of one of the statutory provisions in section 10.001, but "[t]he court may not award monetary sanctions against a represented party" for making an unwarranted or frivolous legal contention in contravention of section 10.001(2). *Id.* § 10.004(d).

"Our analysis of a motion for sanctions filed under Chapter 10 is the same as our review of a motion filed under Rule 13." *Drummond*, 508 S.W.3d at 675 (citing *Nath I*, 446 S.W.3d at 361). As with sanctions under Rule 13, the trial court "must hold an evidentiary hearing to make the necessary factual determinations about the party's or the attorney's motives and credibility." *Drummond*, 508 S.W.3d at 677. "The party moving for sanctions must prove the pleading party's subjective state of mind." *Id.*

### D.     Inherent power to sanction

"A trial court possesses the inherent authority to impose sanctions for a bad faith abuse of the judicial process even when the specific conduct is not covered by a rule or statute." *Phillips*, 2019 WL 3121856, at *7; *see In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) (holding that courts possess inherent power to discipline attorney's behavior); *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398–99 (Tex. 1979) (recognizing that court has inherent power to impose sanctions to aid in exercise of its jurisdiction, in administration of justice, and in preservation of its independence and integrity). "A trial court may exercise this inherent authority as necessary to deter, alleviate, or counteract a bad faith abuse of the judicial process." *Phillips*, 2019 WL 3121856, at *7.

## III.   The trial court did not abuse its discretion by imposing sanctions.

In both of their appellate issues, the Andersons argue that their suit was not groundless because they had standing to bring it. In their first issue they argue that the evidence was legally and factually insufficient to support the sanctions order. In their second issue, they argue that there is no evidence to support the trial court's sanctions order. They also argue that Andrea failed to overcome the presumption that they filed all their papers in good faith.

**A.      Legal and factual sufficiency are not the standard of review.**

In their first issue, the Andersons challenge the legal and factual sufficiency of the evidence to support the trial court's order. As we have explained, the proper standard of review for an appeal from an order imposing sanctions is abuse of discretion, and we will affirm if there is substantive and probative evidence to support the court's ruling. *Brewer*, 601 S.W.3d at 717.

The trial court's order did not explicitly cite the authority for imposition of sanctions, but it did include factual findings that demonstrate the reasons why the sanctions were imposed. Therefore, we will uphold the trial court's order on any legal theory supported by the record. *See, e.g.*, *Guar. Cnty. Mut. Ins. Co. v. Reyna*, 709 S.W.2d 647, 648 (Tex. 1986) ("We must uphold a correct lower court judgment on any legal theory before it, even if the court gives an incorrect reason for its judgment."); *Estate of Riley*, No. 01-22-00504-CV, 2023 WL 5208046, at *2 (Tex. App.—Houston [1st Dist.] Aug. 15, 2023, no pet.) (mem. op.) ("A reviewing court must uphold a correct trial court judgment on any legal theory properly before the trial court.").

**B.      Standing is not enough to show that the sanctions were improper.**

The Texas Family Code provides that, among other parties, "a person, other than a foster parent, who has had actual care, control, and possession of [a] child for at least six months ending not more than 90 days preceding the date of filing of

23

the petition" has standing to file a suit affecting the parent-child relationship." TEX. FAM. CODE § 102.003(a)(9). "[A] nonparent has 'actual care, control, and possession of the child' under section 102.003(a)(9) if, for the requisite six-month time period, the nonparent served in a parent-like role by (1) sharing a principal residence with the child, (2) providing for the child's daily physical and psychological needs, and (3) exercising guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents with their children." *In re H.S.*, 550 S.W.3d 151, 160 (Tex. 2018). The evidence was undisputed that Andrea and Dora moved in with the Andersons in June 2019, and Dora remained with them until she was returned to Andrea in May 2020. The Andersons filed suit in June 2020. It is undisputed that the Andersons were never appointed to be Dora's foster parents.[8] The trial court found that the Andersons had standing under the Family Code, and Andrea is not challenging that finding on appeal.

In their original SAPCR, the Andersons sought sole managing conservatorship of Dora.[9] This required them to rebut the parental presumption in

---

[8] The appellate record is otherwise utterly silent as to the nature or parameters of Andrea and Dora's placement with the Andersons, and what, if any, understanding was in place about the Andersons' responsibilities to provide for Dora within the context of the program established to assist minors, like Andrea, who had been victims of human trafficking.

[9] The Andersons also sought to deny Andrea access to Dora, or, in the alternative, to grant Andrea only limited, supervised visitation. Until Andrea left the Andersons'

favor of Andrea by showing that appointment of Andrea as sole managing conservator "would not be in the best interest of [Dora] because the appointment would significantly impair [Dora's] physical health or emotional development." TEX. FAM. CODE § 153.131(a) (parental presumption); *see In re V.L.K.*, 24 S.W.3d 338, 341–42 (Tex. 2000).[10] The facts that support a determination that the Andersons had standing to file suit were different from the facts needed to show that their pleadings were not groundless. In other words, the fact that they had actual care, control, and possession of Dora for more than six months did not necessarily mean that the allegations in their pleading were based in law and fact. The trial court found that they were not and imposed sanctions. We agree that a showing that the Andersons had standing was not sufficient to prove that the suit was not groundless and in bad faith or brought for the purpose of harassment.

## C.    Substantive and probative evidence supports the sanctions order.

In its order, the trial court found that the Andersons acted in bad faith by consciously prosecuting the case for dishonest, discriminatory, or malicious purposes, and that they did not act simply with bad judgment or negligence. The

home in February 2020, Andrea had been the only person continually present in Dora's short life as they moved from home to home.

[10]    "Chapter 153 also provides that the parental presumption is rebutted if the natural parent has 'voluntarily relinquished actual care, control, and possession of the child to a nonparent' for one year or more and the appointment of a nonparent as managing conservator is in the best interest of the child." *In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000) (quoting TEX. FAM. CODE § 153.373). Dora was returned to Andrea about two weeks shy of one full year with the Andersons.

trial court also found that the suit was groundless. This tracks the Rule 13 standard for the imposition of sanctions. *See* TEX. R. CIV. P. 13; *Thielemann*, 371 S.W.3d at 294. The evidence supports these findings.

To determine whether sanctions were properly imposed under Rule 13, we must consider the evidence in light of the trial court's credibility determinations. Some of the evidence relevant to our analysis was contradicted at the sanctions hearing, and the trial court's findings indicate that the court did not find the Andersons to be credible. For example, while the Andersons maintained that they were concerned about Dora's well-being, the trial court characterized their concern as "feigned." The trial court also noted that the Andersons "made at least one report to [DFPS] that was false or lacked factual foundation."

The Andersons filed this suit days after the trial court determined that Dora should be returned to Andrea and that "there was no serious immediate question regarding the child's safety" in Andrea's care. They have repeatedly alleged that Andrea was engaged in illegal behavior and involved in a "risky lifestyle." This allegation had no basis in fact, as demonstrated by Wilson's testimony. The testimony about Andrea's emotional fitness to parent was disputed. While the Andersons and Wilson voiced concerns based on events two or three years prior and on general, vague statements about "mental health," Veronica testified about how well acquainted with Andrea she was at the time of the hearing and gave her

26

opinion that Andrea was emotionally fit to parent to her daughter, despite Andrea's previous trauma. There was no other evidence on this point, and the trial court, as the factfinder, was free to believe Veronica and disbelieve the Andersons. Based on this evidence, we conclude that there was no basis in fact to support the Andersons' SAPCR at the time that it was filed.

There was also no basis in law. The Andersons' suit was premised on their belief that they could provide the "best" home for Dora, not that Andrea was an unfit parent. The law presumes that a fit parent's conservatorship of her child is in her child's best interest. *See In re C.J.C.*, 603 S.W.3d 804, 818–19 (Tex. 2020) ("[W]e read any best-interest determination in which the court weighs a fit parent's rights against a claim to conservatorship . . . by a nonparent to include a presumption that a fit parent acts in . . . her child's best interest."). "And it goes the other way, too: no child should be deprived of her biological parent unless the law requires it." *In re A.P.*, 672 S.W.3d 132, 136 (Tex. 2023) (J. Young, concurring in denial of petition for review). Thus, the parental presumption "is consistent with the child's own interest in the 'familial relationship,' which 'stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promot[ing] a way of life through the instruction of children.'" *C.J.C.*, 603 S.W.3d at 819 (quoting *Smith v. Org. of Foster Fams. for Equal. &*

*Reform*, 431 U.S. 816, 844 (1977)); *see Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972).

The Andersons had no factual or legal basis to support institution of a SAPCR days after the court determined that there was no serious immediate question regarding Dora's safety in Andrea's care. Thus, the record supports a conclusion that the Andersons' suit was groundless. *See* TEX. R. CIV. P. 13.

The record also supports a conclusion that the Andersons acted in bad faith or for the purpose of harassment. The trial court, as factfinder, could have credited Veronica's and Andrea's testimony that the Andersons threatened Andrea when she picked up Dora, and the court could have disbelieved the Andersons' and their neighbor's testimony that they did not. Viewed in the light of this implicit credibility determination, the Andersons filed their lawsuit soon after the writ hearing and after they threatened to take Dora from Andrea. In the lawsuit, they sought sole conservatorship of Dora and asked the trial court to deny Andrea any access to Dora.

Finally, the court found that the Andersons made at least one report to DFPS that was false or lacking in foundation. In September 2020, the Andersons made a report to DFPS that alleged neglect and the same accusations of illegal behavior that had been rejected by the court months earlier. By the time they made this report, they had not had contact with Andrea and Dora in many months, and they

28

did not know where or how they were living or whether Dora was receiving any educational support. In addition, at four years old, Dora was not required to be enrolled in school. The court could have concluded that the Andersons made this unfounded report to DFPS to gain an advantage in their litigation. This is particularly so because they did not initially tell DFPS about their pending SAPCR, and they had not yet served Andrea with the suit.

To the extent that these circumstances did not exist at the time that the Andersons filed suit, they cannot properly support an award of sanctions under Rule 13. *See Drummond*, 508 S.W.3d at 676. But they can form the basis for sanctions under the trial court's inherent authority "for a bad faith abuse of the judicial process even when the specific conduct is not covered by a rule or statute." *Phillips*, 2019 WL 3121856, at *7. While no rule or statute prohibits a party from making a report to DFPS regarding a child who is the subject of a SAPCR, here there was evidence that the Andersons' report was "false or lacked factual foundation." As a result of their report, DFPS intervened in Andrea's life causing her disruption, worry, instability, and financial stress without any evidence that she had mistreated Dora. DFPS also intervened in the Andersons' SAPCR, which was not promptly served on Andrea.

Based on the evidence in the record, we conclude that the trial court did not abuse its discretion by imposing sanctions in this case.

## Conclusion

We affirm the trial court's order.


Peter Kelly
Justice

Panel consists of Justices Kelly, Landau, and Farris.